Call the case please. Thirteen thirty-fourty-eight. It is represented by Mary Solomon. If the parties who are going to, the council is going to argue could approach. Tell us who you are and who you represent. My name is Matthew Arnaud and I represent Irene Solomon who is the appellant in this case. All right. Assistant State's Attorney Marie Spokusa and I represent the FLE Cook County in this case. All right. We've allocated 15 minutes a piece, but we don't have anything after you. So if you get overly loquacious, we probably won't give you any grief. Save some time for rebuttal. The microphones are for recording, not for amplification, so please keep your voices up. Okay. Thank you. Thank you, Judge. Thank you for the opportunity to argue our position. As I identified before, my name is Matthew Arnaud. I'm with Birnbaum, Haddon, Gelfman, and Arnaud. I represent Irene Solomon who is the appellant in this case. Judge, I'm here to persuade you that the trial court erred in misapplying the strength of evidence needed to rebut the statutory presumption in the Income Withholding Support Act. In this particular case, the trial court denied Irene Solomon's request for the statutory penalty prescribed within that act, finding what I have termed the I made a mistake argument sufficient to rebut the presumption the failure to withhold was knowing. In this particular case, there were stipulated facts that on two occasions, Irene Solomon, a single parent of two children, did not receive child support from Providence Hospital, Cook County Hospital, at which her ex-husband, Dr. Solomon, worked in a notice of withhold was served. And Mrs. Solomon didn't realize the first mistake. She didn't call the first mispayment to anybody's attention. That is correct, Judge. Is there anything in the record to indicate whether she called it to her ex-husband's attention? Because obviously she would have known, Dr. Solomon would have known when he got his paycheck, that there was no withholding for child support. There was nothing in the record that suggested that Mrs. Solomon contacted Dr. Solomon. The first notice or awareness of Mrs. Solomon contacting anyone was after the second mispay check, which was in June of 2011. Yes. And Providence then told her about the first mispayment. Correct. Irene Solomon contacted our office. She dealt with an attorney by the name of Aaron Masters. It's identified in the record. Aaron Masters contacted Providence to inquire as to what was to be determined the second check, the June check, Deidre Williams indicated in that phone conversation in the record that at the time that both checks, at the time that both paychecks were issued to Dr. Solomon, she questioned why that was, why there was not a withholding. So Providence Hospital, by the record, was on notice, well, we returned the third time, but at least in December of 2010 or January of 2011, when that paycheck was issued, that Providence had failed to withhold. Because they brought it to our attention, but the record in the trial court indicates they were aware of it, at least Deidre Williams was aware of it at the time the amount was not withheld. Well, just because they were aware of it doesn't mean there wasn't an error. The fact here is that all these cases have to do with whether the computer system has been correctly informed how to take out the money, whether it's biweekly or bimonthly. And apparently, you know, the same month, one year later, the check is withheld. So that seems to be a mistake, doesn't it? Well, the evidence of the trial court indicated Deidre Williams testified that she inputted the computer code to change Dr. Solomon's pay from every two weeks, from bimonthly to, I'm sorry, from. It's confusing. Correct. This woman has hundreds of these. She's been doing this for years. It's true. And it would be even more pressure if she had to withhold while the appellate court was watching. But in this particular case, the testimony from Deidre Williams was, I changed the code. She said, I probably changed the code, was her initial testimony. I probably changed the code. But then they never produced any documentation that the code was actually changed. So we don't know really what happened with those two paychecks. So we do know, and this is my assertion, that in this case, the presumption has a strong public policy backing. It was created in 1993, as the court well knows. It was in response to the Clinton administration and the federal government saying, clean up your child support enforcement, and we're going to tie your cleanup to that enforcement until you clean up the child support mechanisms. And so what our legislature did in 1993, they went beyond the federal mandate, and they actually put in this penalty with respect to employers. They didn't have to do that. And the public policy behind that was because we had a serious crisis with delinquent child support. And so because the public policy of this act, of the penalty, is so strong, it creates the need for clear and convincing evidence to rebut the presumptions. All presumptions are related to the public policy that it correlates to. But there's no, I mean, even accepting that as true, there is no evidence that Providence acted willfully. I mean, ultimately, that it acted willfully in failing to withhold from the months where there were three paychecks. Okay. The word willful is nowhere to be found in the statute. What we have in the statute is knowingly. And so the question is whether they knowingly failed to withhold. And the statute creates a presumption after two in this case that they did. So we have the. But the cases you cite are cases where there are consecutive months where child support is not withheld, despite the fact that the withholding order was served on the employer, or circumstances where there's an inference that the entity withholding just said, I'm not going to do it, or I'm going to hold on to it and not remit it to the spouse. That doesn't seem to apply here. Well, the only case where it was found that there was not a knowing violation is the Thomas and Denier case. That's the only case where it found there was not a knowing violation. And if we look at the Dunahee case, which is really the first case in 1995 that dealt with the issue, the Dunahee case spoke to the addition of this penalty to show that the intent of the legislator was to have strict enforcement. Now, back to the Thomas and Denier case. In that case, the facts are very idiosyncratic. In that case, they actually withheld support when the employee wasn't working at all, because they were so cognizant of their obligation. In that case, where the employee worked one day, they actually withheld $77 and actually took the check to the attorney's office. In that case, the only other check at issue was a case they mailed to the State Disbursement Unit. It came back because it was to the wrong payee, and they immediately corrected it. All of these actions were done prior to the filing. My point in this case is that at least in December of 2010, when Deidre Williams testified, I questioned why the money didn't come out of Dr. Solomon's check, which is a remarkable statement when you consider she has 500 different child support withholdings that she deals with. So it's a remarkable statement that she questioned that in December of 2010. She also testified, I questioned that in June of 2011, why it wasn't held out. That shows that there was knowledge that there was something wrong. Now, we have to read that along with the time that Dr. Solomon comes in right after the withholding order is entered, and he sits down with Deidre Williams and says, there's been a mistake here. You're withholding too much. And at that point, she reviewed it, and she corrected the mistake that Dr. Solomon had brought to her attention. In this case, she had an obligation. She knew, therefore Provident knew in December of 2011, in June of, December of 2010, June of 2011, that there was something amiss here. Isn't there a difference between what you're saying and what the statute says? You're saying knowing, that she knew, right? She knew. That's what you're emphasizing, the word know. Yes, yes. But the statute says that the payor knowingly fails to withhold. It's not just their knowledge, but the failing to withhold. She didn't do anything to purposely, to knowingly withhold that money. I mean, she didn't say, well, we're not going to pay. She didn't say, well, we weren't served. I mean, there's lots of excuses that people can give. In this case, she might have known there was an error. And this is, on the state side, is a compound of errors that weren't corrected. And the fact that they're all the same error, and it could be something that people could, that happens from time to time, it just so happened here, but it's that she knowingly failed to withhold. If she went into the system and changed it so he didn't have anything taken out of his check, that would be knowingly fails to pay. But isn't there a difference between knowledge and knowingly failing to pay? Well, once you have knowledge that there was something amiss with the failure to pay. But she paid the first time. I mean, she paid the first time in 2010 as soon as she found out. No, in December 29, 2010, which was the third paycheck in December, they didn't pay that until we brought it to their attention in August of 2011. I'm talking about the first one. The first one she paid as soon as she verified it. I think the record will indicate, Your Honor, that there were two missed paychecks, and neither one was paid until we brought it to their attention in August of 2011. So the record indicates that she was questioned at the time of December 2010, but didn't remedy it. And so once you know... But I thought she tried to remedy it. I mean, she thought she remedied it, but apparently she didn't because it happened again. Are you saying, was there any evidence that she deliberately did not remedy it? That she knowingly did something so it wouldn't be remedied? Well, my contention is that when she knew that there was something amiss, she had an obligation to remedy it. And by not remedying it, it is knowingly failing to withhold the money. If she knew it should have been withheld at that time and she failed to act, which the record shows, then that shows knowledge of the failure to withhold. So you get one strike and you're out. No. In this case, the act prescribes that more than one will create the presumption of knowing. So I think, actually, the act almost allows you, based upon the presumption, that you get one strike and you're okay. You know, so I don't think it's one strike and you're out. So you've made two strikes and you have presumption. And you're saying, of course, that the possible did not overcome the presumption. That's correct. The court found, based upon credibility evaluation... I'm sorry, Your Honor. No, go ahead. They found D.J. Rowlands credible. My contention is that the evidence that D.J. Rowlands presented was not clear and convincing or as described as irrefragable proof, more than just the burden of persuasion where I just tipped the scales, because her testimony was, I probably entered the code. Despite having 17 months between the time of filing and the time of hearing, they never produced any kind of documentation which indicated or corroborated that they actually entered the code that way, that she was put on notice at least a third and fourth time with the two paychecks that were missed and did nothing until we called. And so my contention is that's not clear and convincing evidence which would rebut the presumption. No case deals with what the standard is to rebut the presumption. No case directly addresses that. I would suggest that the Donohue case is the closest that addresses it because they say when they reversed the trial court and found a knowing violation, the Donohue Fourth District case said there was no compelling evidence presented by the defendant as to why they failed to withhold. So the compelling evidence, I think, ties into... Were the failures to withhold in Donohue on consecutive months? The failures to withhold on the Donohue case... Let me address your question specifically, Your Honor. In the Donohue case, what happened was they put together two or three or four paychecks at a time. So they actually withheld the money, but they would store up the checks because the employer thought it was, I guess, more economical to mail the checks in a bundle. Was the Donohue case the one where the employer was related to the ex-spouse? I don't think the Donohue case was, Judge. I think the Miller case was, where I think in that case there was a relation. But I don't recall if the Donohue case was. Could the actions of this person at Provident be correctly described as amounting to a bureaucratic mix-up or mistake? Initially, if the trial court believes that the bureaucratic mistake was the inputting of the wrong code to take out 24 paychecks within 26, yes. Bureaucracies don't make the same mistake twice? You've lived in Chicago a while, haven't you? All my life. But that's why I still have faith in government. But I think at the point in December of 2010 and June 2011, at that point when there is knowledge once again that a mistake was made, then there is the triggering of the obligation. To read your question, would it have been enough if they showed with clear and convincing evidence that they inputted the wrong code and had no knowledge after that about the missed paychecks? I think in that case my client would likely lose. But I think in this case, when essentially after she said she inputted the wrong code, Dr. Salomon comes in and once again shows her the notice of withhold, which clearly says on its face 10-15 biweekly, shows her then as to the biweekly nature of the withholding. And then in December and June, at that point it becomes more than an excusable bureaucratic mistake. It becomes one with actual knowledge. If we find that the standard can be rebutted by ponderance of the evidence, do you lose? I think with the standard against the manifest weight of the evidence and the trial court finding D.J. Williams credible, then I don't think that with this Court's deference to the trial court that my client would win at this level. I would suggest that the standard should be clear and convincing, though because of the public policy behind the presumption embedded in the Act. But that is an open question. There isn't any case that specifically has decided what that standard should be. There is no discussion other than the Donahue case referenced as compelling, and I would suggest a reading of all the cases as a whole where we only have one case, the Thomas-Nier case where the appellate court said this is not an annoying violation.  Although not specifically designated or analyzed in any of those cases. Do you believe we should be considering the Murray case? Well, I think you should consider the Murray case, and I think to a large extent that may be why we're here. We address the issue of waiver in our briefs. This Court, and I'm not going to spend a lot of time on this, but this Court has found a waiver in the Martin v. C.H.A. case, 264. Well, you cited several cases. Okay. All right. So they didn't raise the trial court level. But assuming that this Court finds no waiver, the Court should absolutely look at the Murray case but not follow it. I think the Murray case is patently wrong for the following reasons. First of all, it's a second district case. You're not obliged to necessarily follow it. But the first district. Correct. Abraham Lincoln said I was wrong back then when he changed his mind. But in this case, the penalty prescribed in the act we do not believe is a punitive damage penalty. It's a coercive penalty. And I think if we look at the Miller case, although the Supreme Court looked at that more in the constitutional argument and the rational basis, but they described it not being a penalty. The Chen case described it not being punitive. The Chen case said it's not punitive. Now, we know the Chen case was also decided by the second district, so I guess they could change their mind as well. But this is a punitive damages are things that can be decided by whims. There's no measure of calculation necessarily to punitive damage. In this case, there is an exactitude as to what the penalty is. And we have to. The statute instead said the penalty is trouble. And that's the Paulson case. Right. Correct. And I think, you know, with one distinction, the Paulson case, in the nursing home statute, they actually accepted state and federal governments. They somehow in poor draftsmanship included county government entities, and I think that had a role to play in it because it didn't seem to make sense to say, okay, county agencies could be liable for trouble damages, but state and federal could not. So I think that played a role in it. But the trouble damages, once again, they don't serve the purpose of the coercive nature of the penalty, and the reason why it's similar to, let's say, indirect. I mean, punitive damages, whether they're fixed or not, one of the purposes is to deter the conduct that is prescribed. Well, that's correct. When you're talking about coercive, it's coercive whether it's an indefinite sum or a definite sum. But it's not necessarily punitive. And in this case, as Miller described, when single parents go without child support and, therefore, their children then miss mortgage payments, I think that these kind of things certainly have an effect. Now, let's read the public policy of the two acts together because I think, you know, the argument that somehow they contradict each other in the Tort Immunity Act controls, I think, is wrong. First of all, I think we have to assume that the legislature, when they drafted and passed the 1993 Income Withholding Support Act, that they knew about the Tort Immunity Act, which I think was enacted in 1971. So they knew about it then. And so they had that in the rearview mirror when they drafted this legislation. Now, interestingly enough, as I mentioned before, when our legislature drafted that penalty on employers, $100 a day, they went above and beyond the requirements of the federal government. Okay? So they knew what they were doing when they prescribed the penalty. Now, with respect to, you know, this is a situation where an employer, or in this case a government agency, and, you know, the Murray briefs talk about the definition. We have the legislature indicating in their definition of income, income from, they list all the different government agencies. So they were included within the scope of the act. So I don't think they made a mistake with this. But what we also have is the government agency has put on notice as to their obligation. And they know what they have to do. And they are in complete control of whatever penalty could be prescribed. So in that sense, it's not punitive because they have control over it. And it's only after they disregard their obligations under the act does the penalty inert. Now, what's interesting is the 2012 amendments. The 2012 amendments actually added another duty on the obligee to notify the employer if they believe that they have not received the proper child support. And the employer then has 14 days to respond and say, well, I don't think you're right, or to pay over the money. If they pay over the money, the penalty does not accrue. And that wasn't available. It wasn't available in the Solomon case. That was not. But they added that in 2012 to once again, I think, show that it's not a punitive penalty because there's even more ameliorative measures that are taken here so the penalty is avoided. Isn't that amendment an indication that in our circumstance, in December of the first payment, Mrs. Solomon didn't even realize she didn't get it. It wasn't that she wasn't able to buy food for her children or the necessities of life. She just didn't even realize it. That that amendment then says it's not a knowing failure to remit. The additional language in Section 45, and it's not within the actual description of the knowing violation, the presumption still holds. It just prescribed another duty on an obligee, which I would suggest was because of the intense lobbying that business groups might do due to the cost related to this. But I don't think there's an indication of changing this idea of knowing. It just put on another level of obligation on, in this case, the person who receives child support. But the public policy behind the TIA and the Income Withholding Act are the same. It's to protect the taxpayers. In this case, single parents who have children are taxpayers too. Beware the law of unintended consequences, because if somehow the government is accepted from this obligation and there is a deteriorating effect where some of these families who don't get their child support on time or at all don't get it, they also could then go on the government dole, if you will. And so the statutes can be read together with the same kind of public policy concerns. And I think especially we have to look at Illinois' storied history with respect to how it treats children of divorce, and I think there needs to be some reference when we look at this entire case and whether or not the burden should be clear and convincing, whether the TIA applies. But looking back to the 1978 Kijewoski case, which dealt with the issue of whether or not a college provision or potentially a court demanding that a parent of a divorced child contribute towards that child's college. And there are serious equal protection problems or issues raised with this. And it's interesting to note that Illinois is one of only 13 states that have provisions like this. The other 37 states don't. South Carolina struck down their statute because it violated equal protection. And what Justice Moran said in the Kijewoski case in 1978 was essentially that the children of divorced families are a special group. Equity demands that somehow we look out for them. And I think, although there was some dissent to the decision, this panel had that in mind when thinking about the Eckersall case, although there was some difference of opinion in that. But it's a special kind of situation. Much like the Income Withholding Child Support Act, the public policy behind it is similar to the decision in Kijewoski, which indicates that we have a serious problem with delinquent child support. We have to remedy it. And so it really has to be considered with respect to its public policy background. I'll ask you to wrap up, if you could. All right. Well, I just, you know, once again, with respect to the strength of evidence, I think it's very similar to the strength of evidence needed with respect to cases where undue influence is alleged in a fiduciary relationship. And, you know, because the public policy in those kind of situations, and in this situation with respect to collecting child support is strong, it should be clear and convincing evidence. D.J. Williams' testimony was ambiguous and contradictory. She only said, I made a mistake. She didn't show any corroborative documentation. In fact, she entered the wrong code. She was put on notice no less than four times. And I don't believe that the evidence presented was enough to rebut the presumption embedded in the statute that there was knowing failure. Thank you. Thank you. May it please the Court, Assistant State's Attorney, on behalf of Cook County. The Illinois Tort Immunity Act prohibits the assessment of the punitive damages against the county. In Ray, Marriage of Murray, 2014, L.A. up second. Why should we even consider it? Because you could have raised that to the trial court, could you? Yes, Your Honor. I did not raise that. That's correct. The cases that are cited, however, in Ray, the Marriage of Wolfe, and the second case, the Bonner case by the petitioner, indicates that the second district did consider the petitioner's arguments in those cases. They ultimately, even though they found they were waived, they did go on to analyze and make a determination. Well, we're considering it. It sure sounds waived. Okay. In that Murray case, the appellate court, just like in this case, there was a $50,000 penalty imposed by the trial court's decision on a county conservation district where the employer's payroll service failed to process five child support checks in the same, just like in this case,  The Tort Immunity Act applies to discretionary conduct by government actors, right? Yes. There is no discretion to fail to withhold child support. It's a ministerial act. It is a ministerial act, and I will get to the mistake argument. But if it's a ministerial act, meaning there's no discretionary, there's no decision-making involved, the Tort Immunity Act doesn't apply. I believe that the Murray court, Your Honor, found that they looked at Section 2.102 of the Illinois Tort Immunity Act and found that Section 35 of the Income Withholding Support Act and that initial section, the prefatory section, 2.102 of the Tort Immunity Act, could be read harmoniously. If the Tort Immunity Act only applies to discretionary decisions, how does 2.102 even come into play when you're talking about a ministerial act? Because it's clarifying the rule. I'm sorry. Because it's an exception to the common law tort liability of a government entity. Yes. We have to strictly construe it. And so the act says government's going to be liable except in discretionary act cases. If the government has a ministerial duty to act and they violate it, they're liable in tort just like anybody else, right? I believe it goes to the relationship between the Tort Immunity Act and the assessment of the punitive damages against the ‑‑ I guess my point is if a government actor violates a ministerial duty, they don't act when they have an undeniable obligation to do that, they can be assessed, the government entity can be assessed punitive damages. The Tort Immunity Act just doesn't apply. I think in the case where there is a mistake, Your Honor, I think the court, the Murray Court is saying that you read them, you read the cases, you read the acts, both the Income Withholding Support Act and the Illinois Tort Immunity Act together. Okay. I didn't see any analysis of the ministerial discretionary distinction in Murray. That's correct. They only looked at the punitive damages and found that their prefatory phrase when it says notwithstanding any other provision of law, that that was intended to clarify the relationship between the Tort Immunity Act, prohibiting the assessment of punitive damages against a local public entity and all other statutory or common law damages against a local public entity in certain circumstances. So you believe Section 2102 means that a government actor can never be assessed punitive damages, period? No. No, I think when you're looking at the Tort Immunity Act and Section 35 of the Income Withholding Support Act, the Murray Court is finding that they can be read harmoniously together and that that's what is stopping the assessment of the punitive damages against the local public entity. Let's look at the better part of your argument where you talk about the nature of the mistake that was made here. Thank you, Judge. I'll move on. The petitioner in this case failed to prove a knowing violation by Cook County and therefore is not entitled to penalties. Now, it is true the Income Withholding for Support Act 750 ILCS 28-35A states that the failure of a payor on more than one occasion to pay amounts withheld to the State Disbursement Unit within seven business days after the date the amount would have been paid or credited to the abligor creates a presumption that the payor knowingly failed to pay over the amounts. What did the trial court find here? The trial court found that the testimony of Ms. Williams and as well as applying all the facts in the case law that was argued and that exists where employers have been penalized demonstrates that the county rebutted the statutory presumption and proved that the county did not knowingly or intentionally withhold the two missing child support payments in this case. What is the standard of proof for that, for overcoming the presumption? Well, the standard of proof would be, I think we should go back to the findings of fact of the trial court, are not disturbed by the reviewing court unless they're against the manifest weight of the evidence. Why the manifest weight of evidence? Counsel just argued it should be clear and convincing evidence. If you look at, Your Honor, the Thomas v. Diener case, 351, ILAP, 3rd, 645, Act 652, the Thomas v. Diener case clearly states that it's what the standard of review is. What does it state? Is it manifest weight of the evidence? Yes. It says findings of fact by the trial court are not disturbed by a reviewing court. That's a finding of fact. Right. What about the presumption? We're talking about something different. The presumption, I believe counsel was arguing it's the Dunahee case. I just wanted to correct the record. I believe we were talking about Dunahee v. Chenoweth Welding and Fabrication, 273, ILAP, 3rd, 2201, and it's a 1995 case, Your Honor. So I believe that the following cases, the Thomas v. Diener case and the Chen v. Olner case, are more appropriate to consider, although when you look at the facts in the Dunahee case, you can clearly see that when there's a mistake made by the employer, as happened in the Thomas case, that it's the totality of the circumstances that the court is looking at to determine whether the employer's mistake was intentional. It's not intentional. It's knowing. Is there a difference between intentional and knowing? No. I believe that the courts are using knowing and intentional versus mistake. That that's the opposite of making a mistake. If you do something, you could do something knowingly. I'm trying to think of whether, does doing something knowingly have to be intentional? Well, the Thomas case goes so far as to say. In fact, Cuncil was arguing that it probably wasn't intentional, but it was knowing. It certainly isn't knowing, Judge, and I'm happy to go through the record to point out where I think there's some mischaracterization of the record here. But the Thomas case goes so far as to say that even the negligence of an employer does not rise to the level of knowing. So the courts are clearly looking at how many payments are missed, how many times did the employer miss making a child support payment, was it withheld from the respondent's paycheck in turn, where the respondent worked for an automobile or dealership too. In fact, the record is clear in that case that the payments were withheld from multiple paychecks. But here we have a situation where the individual supervising that area was aware of the mistake the first time, and it happened again. No, Judge, that's where I want to clarify. It is absolutely not in the record that Ms. Williams knew when the mistake happened the first time. What happened and what the record shows is that Dr. Solomon came in shortly after the June 29, 2010 order was entered. Ms. Williams testified she entered it. And then Dr. Solomon contacts Ms. Williams in July or August of 2010 after one payment of $1,100 was withheld. She testified she corrected the amount, and that's at Record Volume 7, pages 64 and 65. But her testimony says, I corrected the amount, I mistakenly did not correct the bimonthly code. So she absolutely does not know that she made a mistake. And the trial court accepted that testimony, and she was subject to cross-examination, and that's what the trial court found. Did she say in December of 2010 that she questioned why there was no withholding from the third check? In December of 2010, no. No, that's the other mischaracterization of the record, Your Honor. Well, let's go back. Pardon me, I'm sorry. Just the first mischaracterization. I'm not clear. Your brief says that Ms. Williams testified that when the client contacted Cook County in July or August of 2010 after one payment was withheld, she corrected the amount, but mistakenly did not correct the bimonthly code. So she acknowledged then that she mistakenly didn't correct the code. Meaning she didn't know that. No, that's not what she said. She said she mistakenly didn't. She should have corrected it is what I think she's saying. Right, but she's saying that at the time of the hearing, two years later. She's not saying I knew. In fact, so if you also look at the record and the affidavit attached, I'll also refer you to the record volume 6, C1266 through C1278, which is the affidavit of Ms. Williams' supervisor, Michelle Evans, at Paragraph 4. It's Exhibit 1, Paragraph 4. At the time, now we're all the way to August 2, 2011. That's the only time that all three parties realized. So you've got Mrs. Solomon, her attorney contacts Ms. Williams. That's when the extent of the mistake was realized, that it went all the way back to the first paycheck, to December 29, 2010. And if you look, and I'll find the site for you, the reason is there's no imputation of knowledge to Ms. Williams. The reason, and she goes on to testify, and I'll find the exact site. She testifies. The reason she knew is because she knows what the, if there's a bimonthly withholding and we've missed one, that means for a fiscal year, she knows when the months were, where there were three pay periods. So she knows that if we missed the June 29, 2011 payment, that we already missed the December 29, 2010. That's when she realizes the error, is during the conversation. So it's her, it's counsel's, for petitioner's telephone call. And if you look, it's at Record Volume 7, pages 66 through 68. Ms. Williams testifies during that telephone conversation. She informed petitioner's counsel of the missing 2010 child support payment. And then she goes on to explain that the reason for that is because she knows that those are the months where there are three pay periods. So if we missed one in a fiscal year, and she knows that's the second one, but it's not until the phone call of August 2, 2011, that Ms. Williams knows that there's a problem. And what does she do? Unlike Chen and the other cases where the Supreme Court, Miller, Ms. Williams immediately looks on the screen, sees that we've made a mistake, and she issues a check for both missing child support payments. And she includes, and there's a third week for the child support that's out. So there's a check cut for approximately $3,000. Within two business days, she corrects the error. That's not the circumstances of the other appellate cases. There's multiple withholdings from employees' checks, from the noncustodial parents' checks by an employer. And the employer purposely does not turn those over for a very, very long period of time, months. And the employers, I notice, you know, either the custodial parent sometimes or the noncustodial parent in some of these cases has come in and contacted the employer. So the employer, those, they're very fact-specific cases. And in this case, it's very clear that Ms. Williams entered the order incorrectly. She made a mistake. When did she make the mistake? When she inputs, so she inputs the, it's the June 29, 2010 child support order. And she received it July, her testimony is that she received it July 7, 2010. So it's inputted on or about, you know, on or about July 7. One payment comes out of the respondent's paycheck. He then goes to the office, goes downtown and talks to Ms. Williams, the responsible party for Cook County. She testifies that she corrected, she corrects the amount, that's at record volume 7, 64, and 65. She corrects the amount, she switches it because the child support order lists a weekly amount, a bi-weekly amount, pardon me, a bi-monthly amount, a bi-weekly amount. So it's got four different amounts on the court order. So she corrects, she corrects the amount from $1,100 and there was an order, pardon me, there was a letter from, on top of the child support order that she received on July 7. And that's where the handwriting said $1,100 and she circled it. It's in Ms. Williams' testimony. It's also in her handwriting. And I believe that the letter refers to $2,200 per month. So she cuts that in half and makes the mistake then when she inputs the order. When Dr. Solomon comes downtown, he says you're taking too much out of my paycheck. She says, okay, she looks at it, sees the bi-weekly amount of $1,015.38, she fixes that. But she forgets to take the code out, the YYNN code that deducts bi-monthly. So it keeps deducting the lower amount bi-monthly. She does not know that she made that mistake at that time. And she clearly testifies to that. So the next contact, the timeline here is Dr. Solomon comes in in July or August of 2010. The next contact she has with Petitioner to even give her a chance to know that she's made an error is August 2nd of 2011 when she's contacted by Petitioner's counsel. And the record is absolutely clear that neither counsel, that Ms. Williams, that Cook County informed counsel that there was a problem. That's not evidence that she knew that she made a mistake back in July of 2010 when she entered the order. She clearly testifies that she knew that the mistake was made because there were three, that December 2010 was a month with three pay periods. So if there's a month with three pay periods, she knows the structure of a bi-monthly order is not to pay in the, they're going to skip the third month of a three pay period month. Because a bi-monthly order is 24 pay periods, a bi-weekly order is 26 pay periods. And that's exactly, talking about the Child Immunity Act, but that's exactly the fat pattern of what happened in Murray. It's just an order that gets entered incorrectly and they skip, but they skipped it for two years. So. I'll ask you to wrap up too. Okay, so I just wanted to go briefly. I think I've hit all the differences in the totality of the circumstances in Chen. There were multiple, there were five and a half months where the employer did not, they did withhold from the non-custodial employees check. They did not turn it over. There was contact by the non-custodial parent to his employer. There was the employer testifying in that case in Chen where he said that his office was in disarray and he, I think they were using ADP as a payroll processor. There was a second. He's there for a period of months and then there's a second payroll processor testifies that she finds a check for $933 on the first responsible party's desk. So I think it's the totality of the circumstances in Chen, in Dunahee, and in Miller that caused the appellate and the Supreme Court to uphold the public policy of making sure that the employers do follow the law and withhold correctly. And I think the totality of the circumstances in this case are clearly on point with the Thomas v. Diener case where there was a mistake made. It was an oversight and it was a not a knowing violation of the Support Act and based on the Thomas case and the distinctions from the other Miller case and the Chen case and the Dunahee case that we would ask that this court affirm the trial court's finding in this matter. Thank you judges. Mr. Arno. Just briefly. Edify us please. I'm sorry? I said you can edify us for a few minutes. Just a few minutes. I think you've heard both sides pretty clearly. I just want to point out that the affidavit of Michelle Williams that was referred to was not part of the evidentiary record of this case. Michelle Evans? I'm sorry? Michelle Evans. Michelle Evans. Thank you. That was attached to a 619 motion in an attempt to defeat Irene's claim as a matter of law. What about Ms. Guza's point that Deirdre Williams did not realize until August when she was contacted by counsel that there was this mistake in December? Thank you. The record indicates, I believe, in the volume 783, she was questioned, Aaron Masters called you on or about in the beginning of August of 2011, correct? And Aaron Masters for context is the lawyer from my office. Answer, correct. Question, now Aaron Masters called you, I'm sorry, question, and at that time it's true that you had said to Ms. Masters that I questioned whether or not Dr. Solomon should be being withheld through his third paycheck at that time. Did you recall saying that to her, and the answer was yes. So during that. You infer from that that she questioned it in December. Correct, because if she takes a cold call from an attorney saying I think my client missed a payment, and the response is I did question that at the time, then I think it can be inferred that at the time of June of 2011 that she did question it. So your position then that as Deirdre Williams, this is her job to make sure these withholding orders are complied with, questioned it in December, knew there was no withholding, and said, oh, well. Correct, and that is a knowing failure to withhold. Now, let's discuss this. Let's say an employer just receives an envelope, which is a notice to withhold, and a support order. It never opens that. Do they have knowledge of the support order, and can they say, look, I never had knowledge, and therefore I didn't knowingly withhold. Now, in this case, Deirdre Williams opened the envelope. She read the order, and the record will show it clearly said 10, 15, 38 biweekly. She had a second opportunity one month later when Dr. Salomon came in. And we can only imagine, I mean, there is certain power dynamics, if you will. A doctor comes in to an administrator and says, look, you're overwithholding. And so she then again reviews the order, which says 10, 15, 38 every two weeks biweekly, and then again in December questions it and in June questions it. I think that shows a knowing failure to withhold, and that shows that by the clear and convincing standard, they did not rebut the presumption of the knowingly failure to withhold. That's all I have, Judge. Justices, I just have one other comment. And with respect to the TIA, and I think Justice Mason's point clearly is well taken, the Murray case doesn't address the issue at all about discretionary act. The Murray case doesn't really deal with the issue of whether it was a knowingly failure to withhold. They just say the TIA applied. I think if we look at Justice Wilson's dissent in the Miller case, when the first district at that time thought the penalty of $1.2 million was excessive and actually reversed Judge Riley's trial court decision. But Justice Wilson dissented, and in that dissent he said, the case before us is not a tort action for damages. It involves a predictable and knowable statutory penalty. And I think Justice Wilson was right with respect to how it applies to the TIA as well. Thank you. We thank both parties for the briefs and the argument today, and we will take the matter under advisement and come back to you directly with our ruling. Thank you very much. We are adjourned. Thank you.